**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

FARMERS COOPERATIVE SOCIETY,
SIOUX CENTER, IOWA

Plaintiff,

vs.

LEADING EDGE PORK LLC &
BRENT LEGRED,

Defendants.

LEADING EDGE PORK LLC &
BRENT LEGRED,

Counter Claimants,

vs.

FARMERS COOPERATIVE SOCIETY,
SIOUX CENTER, IOWA,

Counter Defendant.

No. 16-CV-4034-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

II.   *PROCEDURAL HISTORY*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

III.  *SUBJECT MATTER JURISDICTION*  . . . . . . . . . . . . . . . . . . . . . . . . . *5*

IV.   *RELEVANT FACTUAL BACKGROUND*  . . . . . . . . . . . . . . . . . . . . . . *5*

      A.    *The Credit Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
      B.    *Relationship Under Credit Agreement*  . . . . . . . . . . . . . . . . . . . . . *6*
      C.    *Billing Dispute*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*

V.    *MOTION TO STRIKE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

VI.   *MOTION FOR SUMMARY JUDGMENT*  . . . . . . . . . . . . . . . . . . . . . . *13*

      A.    *Summary Judgment Standard*  . . . . . . . . . . . . . . . . . . . . . . . . . *13*

B.      Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **14**
     1.      Breach of contract  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **14**
          a.      Documentation modification  . . . . . . . . . . . . . . . .   **16**
          b.      Hog care modification  . . . . . . . . . . . . . . . . . . . .   **18**
          c.      Dispute resolution modification . . . . . . . . . . . . . .   **19**
          d.      Personal guaranty  . . . . . . . . . . . . . . . . . . . . . . .   **21**
     2.      Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **22**

VII.   **MOTION TO VACATE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **25**

VIII.  **CONCLUSION**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **28**

## I.  INTRODUCTION

The matters before the court are Plaintiff Farmers Cooperative Society, Sioux Center, Iowa's ("FCS") Motion for Summary Judgment ("Motion") (docket no. 53) and Defendants Leading Edge Pork, LLC and Brent Legred's (collectively, "Leading Edge") Motion to Vacate the Prejudgment Attachment Lien ("Motion to Vacate") (docket no. 70)[1] and Motion to Strike (docket no. 77).

---

[1] The Motion to Vacate is styled as a "Memorandum in Support" of the Motion to Vacate, *see* Motion to Vacate at 1 (caption), and no distinct motion was separately filed. Additionally, the Motion to Vacate references exhibits and an affidavit that were not filed as attachments to the motion.  *See id.* at 2-3 (citing to "Affidavit of Michael M. Sawers" and associated exhibits).  As filed, the Motion to Vacate does not comply with the local rules of the court.  *See* LR 7(b)(3) ("A brief must be filed as an electronic attachment to the motion it supports under the same docket entry as the motion."); *id.* (b)(4) ("If a motion . . . permits consideration of facts not appearing of record, then the moving party must electronically attach to the motion, and file under the same docket entry as the motion, any affidavits, other sworn materials, photographs, or documentary evidence upon which the moving party relies.").

The court does not take violations of its local rules lightly, particularly where, as here, one of the attorneys responsible for the instant violations previously failed to comply with the local rules when seeking admission to practice pro hac vice.  *See generally* May 10, 2017 Order (docket no. 63); *see also* LR 83(d)(3) (rules applying to pro hac vice admission procedure).  Nevertheless, the court will consider the Motion to Vacate as filed. However, the court declines to consider any exhibits that are neither attached to the Motion to Vacate nor to any other non-stricken docket filings.  Counsel for Leading Edge is instructed to review the court's local rules and fully adhere to them in the future.

2

## II. PROCEDURAL HISTORY

On April 11, 2016, FCS filed a petition (docket no. 3) in the Iowa District Court for Sioux County, alleging two claims against Leading Edge: (1) seeking damages for breach of contract; and (2) seeking an order directing Leading Edge to pay such damages from checks co-payable to FCS and Leading Edge. On May 3, 2016, Leading Edge removed the case, bringing the petition before the court. *See* Notice of Removal (docket no. 2).

On July 25, 2016, on FCS's motion, the court ordered that funds previously attached by the Iowa District Court be transferred to the court for attachment in the instant case. *See* July 25, 2016 Order (docket no. 11). The attached funds existed in the form of ten checks issued by Tyson Fresh Meats ("Tyson"), which were purportedly co-payable to FCS and Leading Edge, in the amount of $97,657.73. *See* Ex. C to Motion for Order to Deliver Co-Payee Checks ("Tyson Checks") (docket no. 8) at 12-23. On September 15, 2016, FCS informed the court that the Tyson Checks previously held under attachment by the Iowa District Court were rendered void because they had not been cashed within ninety days of issue. *See* Report to the Court (docket no. 16). On September 16, 2016, the court ordered the parties to instruct Tyson to reissue a single check in the amount of $97,657.73, representing the total of the ten Tyson Checks under attachment, and to deposit the check with the Clerk of Court. *See* Sept. 16, 2016 Order (docket no. 17) at 2. On October 7, 2016, a check in the amount of $94,688.98 was deposited with the Clerk of Court, pursuant to the attachment order. On the same date, FCS informed the court that it was unable to deposit the full $97,657.73 amount ordered by the court because Tyson had reissued one of the Tyson Checks—in the amount of $2,968.75—to Leading Edge pursuant to a "'lost check' replacement request." *See* Second Report to the Court (docket no. 25) at 2. The details surrounding the reissue of this check remain unknown to the court.

On November 29, 2016, FCS filed a Second Amended Complaint (docket no. 44),

3

seeking the following relief from Leading Edge: (1) judgment on a claim of breach of contract; (2) an order directing Leading Edge to pay damages from checks co-payable to FCS and Leading Edge; (3) damages for collection costs, including attorney's fees, contemplated by the contract at issue; and (4) joint and several liability for all damages as to Legred as guarantor of the contract at issue. On December 13, 2016, Leading Edge filed an Answer (docket no. 46), denying liability, pleading affirmative defenses and alleging four counterclaims against FCS.

On April 28, 2017, FCS filed the Motion. On May 19, 2017, Leading Edge filed a Resistance ("Resistance to Motion") (docket no. 66). On June 2, 2017, FCS filed a Reply ("MSJ Reply") (docket no. 73). On June 12, 2017, Leading Edge filed the Motion to Strike, challenging certain evidence produced in the MSJ Reply materials. On June 19, 2017, FCS filed a Resistance ("Resistance to Motion to Strike") (docket no. 78).

On February 13, 2017, Leading Edge filed a prior Motion to Vacate the Pre-Judgment Attachment Lien (docket no. 47). On May 2, 2017, the court struck the motion after determining that, at the time it was filed, the attorneys that had signed and filed the motion were not admitted to practice before the court. *See* May 2, 2017 Order (docket no. 54). On May 26, 2017, shortly after its attorneys secured admission to practice before the court, Leading Edge filed the present Motion to Vacate, which "largely mirrors the [prior] motion." Motion to Vacate at 1 n.1. On June 1, 2017, FCS filed a Resistance ("Resistance to Motion to Vacate") (docket no. 72). On June 8, 2017, Leading Edge filed a Reply ("Motion to Vacate Reply") (docket no. 76).

Leading Edge requests oral argument on the Motion and the Motion to Vacate, but the court finds that oral argument is unnecessary. The matters are fully submitted and ready for decision.

## III. SUBJECT MATTER JURISDICTION

FCS is an Iowa agriculture cooperative with its principal place of business in Sioux Center, Iowa. Notice of Removal ¶ 5. Leading Edge is a Minnesota limited liability company owned by Legred, who is a citizen of Minnesota. *Id.* The court has original jurisdiction over the claims at issue because complete diversity exists between FCS and Leading Edge and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a)(2) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States . . . .").

## IV. RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Leading Edge and affording it all reasonable inferences, the uncontested material facts are as follows.

### A. Credit Agreement

FCS produces custom livestock feed that it sells to livestock producers. Statement of Undisputed Material Facts in Support of Motion ("FCS Facts") (docket no. 53-2) ¶ 1. Leading Edge owns and raises hogs as livestock. *Id.* ¶ 2.

On July 14, 2014, FCS and Leading Edge entered into a contract ("the Credit Agreement") wherein FCS agreed to sell feed to Leading Edge on a credit basis. *Id.* ¶ 3; *see also* Appendix in Support of Motion ("FCS Appendix") (docket no. 53-3) at 8-10. Under the Credit Agreement, FCS created an open account from which Leading Edge could order feed. FCS Appendix at 9. FCS then billed Leading Edge for its feed orders on a monthly basis. *See id.* at 11-166. The Credit Agreement provides that a 1.5% finance charge would accrue monthly on any unpaid balance in Leading Edge's feed account. *Id.* at 9; FCS Facts ¶ 5. The Credit Agreement further provides that FCS may declare Leading Edge to be in default on its account if, among other things, Leading Edge "fail[ed] to make any payment when due." FCS Appendix at 9. The Credit Agreement

5

provides that, if FCS refers Leading Edge's defaulted account "to an attorney for collection, FCS may, to the extent permitted by applicable law, . . . collect from [Leading Edge] FCS's collection costs, including court costs and attorney fees." *Id.* The Credit Agreement also includes a personal guaranty from Legred, wherein he "unconditionally guarantee[s] the full and timely payment of all amounts due from or on behalf of [Leading Edge]." *Id.* at 10.

### B. Relationship Under Credit Agreement

Between July of 2014 and April of 2016, Leading Edge purchased various quantities of feed from FCS, which were charged to Leading Edge's feed account. FCS Facts ¶ 8. When Leading Edge ordered feed, it received a billing statement for the order. *See* Leading Edge's Statement of Additional Material Facts ("Leading Edge Facts") (docket no. 66-2) ¶ 3. The back side of the billing statement included dispute resolution provisions by which Leading Edge could dispute and correct any billing errors reflected on the order. *See id.*; *see also* Appendix in Opposition to Motion ("Leading Edge Appendix") (docket no. 66-3) at 10. Such language included, in part, the following:

> You remain obligated to pay the parts of your bill not in dispute, but you do not have to pay any amounts in dispute during the time the creditor is resolving the dispute. During that time, the creditor may not take any action to collect disputed amounts or report disputed amounts as delinquent.

Leading Edge Appendix at 10.

When Leading Edge ordered a quantity of feed from FCS, FCS would deliver the feed to sites specified by Leading Edge. FCS Facts ¶ 9. Leading Edge's hogs were housed at multiple sites and, occasionally, groups of hogs would be moved from one site to another. *See* Leading Edge Appendix at 35 (describing the occurrence of "pigs [being] moved from one barn to another barn"). Additionally, each site had multiple housing stations, some of which housed Leading Edge's hogs and some of which housed other hogs not belonging to Leading Edge. *See id.* (discussing hogs housed at "Bins 5 and 6" within

6

a particular site). At each site, a caretaker would look after the hogs housed at the site, facilitate the movement of hogs and ensure that the hogs were fed. *Cf. id.* (identifying movement and feeding of hogs by a site caretaker). "Field reps" coordinated with caretakers regarding a particular hog owner's hogs and ensures that all such hogs were accounted for across sites. *Id.* at 45. Doug Lemke was the field rep assigned to Leading Edge's hogs. *Id.*

FCS maintained a practice of acting as an intermediary between Leading Edge and the caretakers at various sites. *Id.* at 68-69; *see also id.* at 31 (stating that FCS would "pass monies through from the pig owner to the caretaker or the barn owner" as a "courtesy service"). In this capacity, FCS received information from the caretakers and reported it to Leading Edge. *Id.* at 68-69. Correspondingly, FCS collected yardage—*i.e.* caretaking payments—from Leading Edge and delivered it to the caretakers. *Id.* Prior to delivering yardage to FCS to pass through to the caretakers, Leading Edge required that FCS provide documentation to support the yardage charges—including "scale tickets and original invoices" and "trucking invoices and barn sheets." *See id.* at 40.

Leading Edge required that FCS maintain separate accounts for each group of Leading Edge hogs and for feed and yardage charges. Leading Edge Facts ¶ 6. Among FCS customers, this system was unique to Leading Edge. Leading Edge Appendix at 28, 33 (describing the structure of Leading Edge's accounts as "[a]typical" and "different than what we standardly do [sic]"). This system required FCS to frequently reorganize Leading Edge's accounts, depending on the movement of hogs from one group to another and/or from one site to another. *See, e.g.*, *id.* at 21, 34. When hog movements occurred without FCS receiving sufficient notice to create a separate account before billing Leading Edge, Leading Edge communicated the discrepancy and delayed payment until FCS assigned the charges to the proper accounts. *Id.* at 30. During the course of FCS and Leading Edge's relationship, FCS made numerous billing errors stemming from the structure of Leading

Edge's accounts. Leading Edge Facts ¶ 11; *see also* Leading Edge Appendix at 33. In the event of these errors, Leading Edge would bring them to FCS's attention and FCS would correct them if warranted. Leading Edge Facts ¶¶ 10, 12-13.

FCS billed Leading Edge on a monthly basis, with each monthly invoice documenting the feed orders filled during that month. *See* FCS Appendix at 11-166 (series of monthly invoices). Each feed account received separate invoices, and each invoice referenced order numbers, "lot" numbers, the sites and particular bins that received each feed order and the quantities and ingredient composition of each feed order. *See, e.g.*, *id.* at 12 (exemplar order filled on June 25, 2015, which bore the order number 892587 and lot number 6152015, was delivered to bins A and B at the Matt Hoffman nursery site and consisted of 4.5 tons of feed composed of ingredients including "GR CORN," "HI PRO SOY" and others). The monthly invoices reflect feed orders only, and do not document FCS's collection of yardage paid to caretakers. *See generally id.* at 11-166.

### C.  Billing Dispute

In late-2015, Leading Edge began refusing to pay on invoices associated with its accounts numbered 102612 and 102655. FCS Facts ¶ 11. The unpaid orders associated with these accounts currently total $18,406.60. *See id.*[2] Each order corresponds to feed

---

[2] Although the unpaid orders total only $18,406.60, the amount in controversy is nevertheless sufficient to trigger the court's diversity jurisdiction. Diversity jurisdiction must be established "either at the time the action is commenced or at the time of removal." *Ellis v. Goldberg*, No. C16-4119-MWB, 2017 WL 878232, at *3 (N.D. Iowa Mar. 6, 2017) (alteration omitted) (quoting *Schubert v. Auto Owners Ins. Co.*, 649 F.3d 817, 822 (8th Cir. 2011)). Good faith allegations of the jurisdictional amount "will suffice to confer jurisdiction, but the complaint will be dismissed if it 'appears to a legal certainty that the claim is really for less than the jurisdictional amount.'" *Scottsdale Ins. Co. v. Universal Crop Prot. All., LLC*, 620 F.3d 926, 931 (8th Cir. 2010) (alteration omitted) (quoting *Kopp v. Kopp*, 280 F.3d 883, 884 (8th Cir. 2002)).

Here, the parties do not challenge the sufficiency of the amount in controversy. At the time of removal, FCS alleged that it was entitled to damages for $56,238.92 in unpaid

(continued…)

ordered by a caretaker on behalf of Leading Edge and delivered to a site known as the Hoffman Site. *See id.* FCS made numerous payment demands for the unpaid orders, which Leading Edge has not met. *Id.* ¶ 12. FCS proceeded to retain counsel for purposes of collecting on the unpaid accounts, ultimately giving rise to the instant action. *Id.* ¶ 15.

## V. *MOTION TO STRIKE*

In the Motion to Strike, Leading Edge seeks to strike an amended interrogatory response and various affidavits submitted with the MSJ Reply. *See* Motion to Strike at 2-5.

During discovery, Leading Edge served an interrogatory request on FCS requesting that FCS identify "any admission of fault or statement indicating responsibility or liability" made by Leading Edge. *See* Leading Edge Appendix at 66. In response, FCS stated, in relevant part:

> On February 16, 2016, a meeting was held with Plaintiff's agent, Doug Lemke, and FCS personnel . . . wherein Mr. Lemke indicated the only location in which Leading Edge was having "problems" was the Hoffman barn.

*Id.* In its Resistance materials, Leading Edge cites this interrogatory response to state that Lemke was, in fact, FCS's agent. *See, e.g.*, Leading Edge Facts ¶ 25; Resistance at 12.

---

[2](...continued)

orders, and to "finance charges and the costs of this action." Petition at 3. Although the amount in controversy must be "exclusive of interests and costs," 28 U.S.C. § 1332(a), the finance charges and costs sought by FCS in the Petition are provided for in the Credit Agreement, *see* FCS Appendix at 9. Where the terms of a contract provide for recovery of litigation costs, the probable value of such litigation costs may be considered when determining the amount in controversy. *See Scottsdale Ins. Co.*, 620 F.3d at 932 (analyzing an insurance policy providing for recovery of "the cost of defending" an action, among other recovery items). When viewing the $56,238.92 in unpaid orders at the time of removal, as well as the monthly finance charges and costs of collection provided for in the Credit Agreement, the relevant filings do not create a "legal certainty" that the claim is for less than $75,000. Accordingly, the court finds that the prerequisites for diversity jurisdiction are satisfied.

9

In its MSJ Reply materials, FCS clarifies that its identification of Lemke as "Plaintiff's agent" was a scrivener's error, and that Lemke was, in fact, Leading Edge's agent.  *See* Reply to Leading Edge Facts (docket no. 73-1) at 1-2.  On May 31, 2017, FCS served Leading Edge with an amended interrogatory response, correcting the error.  Supplemental Appendix in Support of Motion ("FCS Supplemental Appendix") (docket no. 73-2) at 37-40.  Leading Edge characterizes the amended response as akin to a "sham affidavit" incapable of supporting the Motion and argues that it must be stricken.  *See* Motion to Strike at 2-3.

Evidence is "sham" evidence subject to being stricken if it conflicts with earlier-submitted evidence and "raise[s] only sham issues." *City of St. Joseph, Mo. v. Sw. Bell Tel.*, 439 F.3d 468, 476 (8th Cir. 2006) (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1366 (8th Cir. 1983)).  Evidence raises a sham issue if it contradicts earlier evidence for the sole purpose of generating a dispute of fact to defeat summary judgment.  *See id.*  The amended interrogatory response is not sham evidence.  Instead, it represents FCS's timely correction of an error made in its initial interrogatory response.  Federal Rule of Civil Procedure 26(e) provides that a party

> who has responded to an interrogatory . . . must supplement or correct its . . . response . . . in a timely manner if the party learns that in some material respect the . . . response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process.

Fed. R. Civ. P. 26(e)(1)(A).  FCS represents that its identification of Lemke as FCS's agent was an error that it learned of only when Leading Edge pointed it out in its Resistance materials.  *See* Resistance to Motion to Strike at 2.  FCS proceeded to promptly amend the interrogatory response to identify Lemke as Leading Edge's agent.  *Compare* Leading Edge Facts ¶ 25 (citing the initial interrogatory response in materials filed on May 19, 2017), *with* FCS Supplemental Appendix at 39 (reflecting that FCS served its amended

10

interrogatory response on Leading Edge on May 31, 2017). The context of FCS's interrogatory response supports its characterization that it erroneously misidentified Lemke as its own agent. Leading Edge's interrogatory requested that FCS identify any admissions made by Leading Edge. As such, any reference to Lemke can be understood from context to cast Lemke as an agent of Leading Edge. In light of the foregoing circumstances, the court finds that the amended interrogatory response is not sham evidence but is, instead, a timely correction to an error in the prior interrogatory response and the court shall consider it when ruling on the Motion.

Leading Edge also argues that the affidavits of Sally Hoogland, Taylor Francis and Mindi Hulshof, submitted with the MSJ Reply, must be stricken because their contents "go[] far beyond the scope of [FCS's] principal brief." Motion to Strike at 4. In effect, Leading Edge argues that FCS was required to anticipate issues raised by Leading Edge in its resistance and submit evidence relating to those issues at the time it filed the Motion. *See id.* (describing how Leading Edge went "to great length[s] to explain" a certain issue in its resistance materials and faulting FCS for "fail[ing] to address that issue in its principal summary judgment brief"). However, Leading Edge's argument misunderstands the court's local rules. Local Rule 56(d) permits a moving party to file a supplemental appendix containing "additional pleadings, depositions, answers to interrogatories, admissions, exhibits, or affidavits" for purposes of responding to a resisting party's statement of additional facts. LR 56(d). There is no dispute that FCS produced evidence relating to matters beyond those addressed in its initial motion. *Cf.* Resistance to Motion to Strike at 4. However, the production of such evidence—addressing evidence produced and arguments made by Leading Edge in the Resistance to Motion—is fully contemplated by the court's local rules and shall not be stricken.

With respect to Leading Edge's challenges to five particular items contained within FCS's affidavits, *see* Motion to Strike at 4, the court finds that none of the challenges

11

warrant striking. Leading Edge argues that paragraph three of the Hulshof Affidavit contains inadmissible hearsay and that paragraph eleven contains an inadmissible legal conclusion, such that both paragraphs must be stricken. *Id.*; *see also* FCS Supplemental Appendix at 31, 32. The purported hearsay statement is not, in fact, hearsay because it is not offered for its truth. Rather, it provides explanatory context for the eventual reduction in feed orders fulfilled by FCS. *See* Fed. R. Evid. 801(c)(2) (providing that a hearsay statement must be offered "to prove the truth of the matter asserted in the statement"). The purported legal conclusion is an admissible lay opinion, insofar as it is rationally based on Hulshof's perception as an FCS employee and clarifies the respective duties that FCS and Leading Edge had in caring for Leading Edge's hogs. *See* Fed. R. Evid. 701 (providing the requirements for admissible lay opinion testimony).

Leading Edge next argues that the exhibits to the Francis Affidavit, consisting of an incident report filed with the Plymouth County Sheriff's Office and the amended interrogatory response, must be stricken because they were not previously disclosed. Motion to Strike at 4. The incident report demonstrates that Leading Edge's caretaker reported the theft of approximately 360 of Leading Edge's hogs. FCS Supplemental Appendix at 35-36. This exhibit squarely rebuts Leading Edge's claim that "there was no explanation for why [Leading Edge's] pigs were unaccounted for." Leading Edge Facts ¶ 28. Furthermore, the incident report is a matter of public record. *See* FCS Supplemental Appendix at 34 (Francis stating that the incident report was made available upon request to the Plymouth County Sheriff's Office). With respect to the amended interrogatory response, as discussed above, such corrected an error made in the initial response. Local Rule 56(d) permits the production of both items with FCS's reply materials because they directly correspond to facts cited by Leading Edge.

Lastly, Leading Edge argues that paragraph six of the Hoogland Affidavit must be stricken because it contains inadmissible speculation. Motion to Strike at 4; *see also* FCS

Supplemental Appendix at 28. In that paragraph, Hoogland states that she understood that Leading Edge's hogs were consuming the feed ordered by Leading Edge because Leading Edge received the feed and the bins that held the feed regularly became empty and were refilled. FCS Supplemental Appendix at 28. This is not speculation. Instead, it is the well-informed lay opinion of an FCS employee, rationally based on her perceptions and helpful to determining whether the disputed feed was, in fact, appropriately delivered to Leading Edge's hogs. *See* Fed. R. Evid. 701.

For the foregoing reasons, the particular pieces of evidence challenged by Leading Edge shall not be stricken. Accordingly, the Motion to Strike shall be denied.

## VI. MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324).

The court must view the record in the light most favorable to the non-moving party and afford it all reasonable inferences. *See Schmidt v. Des Moines Pub. Sch.*, 655 F.3d

13

811, 819 (8th Cir. 2011). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A complete failure by the non-moving party 'to make a showing sufficient to establish the existence of an element essential to that party's case necessarily renders all other facts immaterial.'" *B.M.* ex rel. *Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013) (alteration omitted) (quoting *Celotex*, 477 U.S. at 322-23).

### B. Analysis

In the Motion, FCS argues that the court should grant summary judgment in its favor on all of the claims raised in the Second Amended Complaint. Specifically, FCS argues that it is entitled to summary judgment on its breach of contract claim, that its cumulative damages amount to $116,808.68, that such damages must be partially satisfied by the court-attached funds and that Leading Edge and Legred are jointly and severally liable for its damages. *See generally* Brief in Support of Motion (docket no. 53-1). The court shall first address the breach of contract claim, including the issue of joint and several liability, before proceeding to address the issue of damages.

#### 1. Breach of contract

"Generally, to establish a claim for a breach of contract, [a plaintiff] must show[:] '(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.'" *Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 706 (Iowa 2016) (formatting omitted) (quoting *Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110-11 (Iowa 2013)).

Leading Edge acknowledges that it has withheld payment of various charges made

14

to its feed account.  *See, e.g.*, Resistance to Motion at 11 (acknowledging that "Leading Edge refused to make payments").  However, Leading Edge argues that summary judgment is not warranted because a genuine dispute of material fact exists with respect to the third element of FCS's breach of contract claim.  *See id.* at 10-12.  Specifically, Leading Edge argues that the parties modified the Credit Agreement to require FCS to submit documentary support for the charges made to Leading Edge's account and to require FCS to care for Leading Edge's hogs.  *See id.*  According to Leading Edge, FCS's failure to perform pursuant to these modifications prevents FCS from recovering on its breach of contract claim.  FCS argues that any purported modifications to the Credit Agreement are per se non-binding because the Credit Agreement contains an integration clause, stating that it "may not be contradicted or amended by evidence of any alleged oral agreement" and that "[o]nly written amendments . . . shall be valid and binding."  *See* Reply to Leading Edge Facts ¶ 1; *see also* FCS Appendix at 9.  Under Iowa law, "a provision in a written contract that it can be modified or rescinded *only* in writing is ineffective (subject, of course, to the doctrine of consideration and the statute of frauds)."  *Whalen v. Connelly*, 545 N.W.2d 284, 291 (Iowa 1996).  Therefore, the blanket prohibition on oral amendments included in the Credit Agreement is ineffective, and the court shall proceed to determine whether the purported modifications identified by Leading Edge were binding on the parties.

"Where two contracts are made at different times, but where the later is not intended to entirely supersede the first, but only to modify it in certain particulars, the two are to be construed as parts of one contract, the later superseding the earlier one wherever it is inconsistent."  *Iowa Arboretum*, 886 N.W.2d at 706 (quoting 17A Am. Jr. 2d *Contracts* § 489, at 469-70 (2016)).  A binding modification must satisfy the same essential elements as a binding contract.  *See Ziskovsky v. Ziskovsky*, 843 N.W.2d 478, 2014 WL 69620, at *4 (Iowa Ct. App. Jan. 9, 2014) (unpublished table decision) ("A written

contract may be modified by a subsequent oral agreement which has the essential elements of a binding contract." (quoting *Berg v. Kucharo Const. Co.*, 21 N.W.2d 561, 567 (Iowa 1946))). As such, a binding modification requires that the parties "'manifest mutual assent to the terms of the contract,' and such assent 'usually is given through the offer and acceptance.'" *Great Lakes Commc'n Corp. v. AT&T Corp.*, 124 F. Supp. 3d 824, 846 (N.D. Iowa 2015) (quoting *Rick v. Sprague*, 706 N.W.2d 717, 724 (Iowa 2005)); *see also Gordon v. Witthauer*, 138 N.W.2d 918, 921 (Iowa 1965) ("A written contract or agreement may be altered or modified by an oral agreement if the latter has been accepted and acted upon by the parties in such manner as would work a fraud on either party to refuse to enforce it." (quoting *Wise v. Quina*, 174 So. 2d 590, 597 (Fla. Dist. Ct. App. 1965))). Furthermore, Iowa law "clearly requires some new consideration to support the modification of a contract." *Margeson v. Artis*, 776 N.W.2d 652, 657 (Iowa 2009). Using this rubric, the court shall analyze the purported modifications to the Credit Agreement identified by Leading Edge.

### a. *Documentation modification*

Leading Edge points to the following evidence in support of the purported documentation modification to the Credit Agreement: (1) a declaration from Leading Edge's bookkeeper that FCS agreed to provide documentation for charges made to Leading Edge's account "[i]n exchange for Leading Edge continuing to purchase feed," Leading Edge Appendix at 6; (2) deposition testimony of various FCS employees stating, in effect, that they understood that Leading Edge refused to pay on its yardage account unless FCS provided documentation, *id.* at 35 (Lorene Farquhar deposition); *id.* at 40 (Mindi Hulshof deposition); *id.* at 43 (Kyle Boersma deposition); *see also* Leading Edge Facts ¶¶ 7-8. The court questions whether Leading Edge's continued purchase of feed is valid consideration to support a modification. *See Margeson*, 776 N.W.2d at 656 (stating that acting on a preexisting agreement does not create valid consideration for a modification). However,

16

assuming arguendo that the record establishes valid consideration, the court nevertheless finds no evidence that FCS's obligation to provide documentation applied to the feed charges at issue in this dispute.

During the parties' business relationship, FCS established a credit account permitting Leading Edge to purchase feed on credit, via the Credit Agreement, FCS Appendix at 8-10, and FCS also collected yardage fees from Leading Edge to pay the caretakers of Leading Edge's hogs, *see* Leading Edge Appendix at 31, 68-69. It is clear from the record that FCS agreed to provide documentation to support its collection of yardage fees. *See id.* at 35 (discussing "backup documentation" with respect to hog movement from site to site); *id.* at 40 (agreeing that "Leading Edge wouldn't pay bills until they had backup documentation" when discussing yardage and barn sheets, but emphasizing that "[t]he feed and the yardage is a separate deal"); *id.* at 43 (agreeing that FCS was advised that it "need[ed] documentation that the service was provided" when discussing payment of trucking charges). However, there is no evidence that FCS agreed to a similar arrangement with respect to feed charges. Indeed, the feed and yardage charges were sequestered into separate accounts, emphasizing the distinction between FCS's feed and yardage duties. *See id.* at 21 (acknowledging that "Leading Edge . . . asked that [FCS] have a separate feed account and a yardage account for each group [of hogs]"); *see also id.* at 32 (Lorene Farquhar testifying that she serviced Leading Edge's feed accounts, while other FCS employees serviced Leading Edge's yardage accounts). Thus, to the extent Leading Edge points to evidence that FCS agreed to provide documentation of yardage charges incurred by Leading Edge, it does not necessarily follow that FCS also agreed to provide documentation of feed charges—beyond what was contained within the monthly invoices provided to Leading Edge, which indicate that the disputed feed orders were placed, delivered and billed accordingly. *See* FCS Appendix at 26-39, 144-45 (monthly invoices reflecting feed orders at issue); *see also* FCS

17

Supplemental Appendix at 6 (FCS employee stating that Leading Edge "never required any additional documentation for feed charges"); *id.* at 26-28 (describing that all feed orders in dispute were properly delivered). Indeed, while the record contains several allusions to trucking bills, "barn sheets" and scale tickets, each documenting various yardage charges, *see* Leading Edge Appendix at 15-16, 35, 40, the record lacks any reference to the kinds of documentation purportedly required for feed charges.

Accordingly, Leading Edge has produced insufficient evidence from which to conclude that FCS and Leading Edge modified their agreement to obligate FCS to provide documentation supporting feed charges—as opposed to yardage charges—made to Leading Edge's account. Therefore, FCS's purported failure to provide feed-charge-related documentation does not raise a genuine issue of material fact regarding FCS's breach of contract claim.

### b. *Hog care modification*

Leading Edge's evidence relating to FCS's purported duty to care and account for Leading Edge's hogs revolves around the conduct of Doug Lemke—the field agent overseeing the care of Leading Edge's hogs. Specifically, Leading Edge points to a declaration from Leading Edge's bookkeeper that "Doug Lemke advised Leading Edge that FCS would manage the growth and feeding of Leading Edge's swine heard," Leading Edge Appendix at 8, and to the interrogatory response submitted by FCS that erroneously identified Lemke as FCS's agent (prior to amending the response to identify Lemke as Leading Edge's agent), *see id.* at 66. *See* Leading Edge Facts ¶¶ 25-27. According to Leading Edge, Lemke obligated FCS to provide proper care and accounting for Leading Edge's hogs. *Cf.* Resistance to Motion at 12. However, even viewing the record in the light most favorable to Leading Edge by assuming that Lemke was FCS's agent and was capable of contracting on FCS's behalf, *see, e.g.*, Leading Edge Appendix at 14-15 (emails from FCS and Leading Edge employees implying that both parties had working

18

relationships and communication with Lemke); *id.* at 31 (FCS employee describing Lemke's job duties in detail); *id.* at 45 (FCS employee testifying that Lemke was a field rep for Leading Edge hogs, and stating that FCS employees occasionally acted as field reps if a customer requested it), there is no evidence that Lemke's statements created a binding modification.

In the declaration from Leading Edge's bookkeeper, she states that Lemke simply "advised" her that FCS would care for Leading Edge's hogs. Absent evidence of any consideration for Lemke's apparent promise, such promise is unenforceable even if Lemke had authority to obligate FCS and intended to do so. *See Gill v. Vorhes*, 885 N.W.2d 829, 2016 WL 4051643, at *12 (Iowa Ct. App. July 27, 2016) (unpublished table decision) ("Regardless of whether [evidence reflected an intent] to accomplish a modification of the written [contract] at issue, any purported modification would be unenforceable for lack of consideration."). Furthermore, Lemke's vague oral statements that FCS would "manage the growth and feeding" of Leading Edge's hogs are not "sufficiently definite for a court to determine with certainty the duties of each party." *Wagner Enters., Inc. v. John Deere Shared Servs., Inc.*, 397 F. Supp. 2d 1097, 1105 (N.D. Iowa 2005) (quoting *Gallagher, Langlas & Gallagher v. Burco*, 587 N.W.2d 615, 617 (Iowa Ct. App. 1998)).

In sum, Leading Edge has not generated a genuine issue of any modification obligating FCS to care and account for Leading Edge's hogs. Accordingly, FCS's purported failure to care and account for Leading Edge's hogs does not raise a genuine issue of material fact regarding FCS's breach of contract claim.

### c. *Dispute resolution modification*

In its briefing regarding FCS's claim for damages, Leading Edge argues for the existence of a third modification in the form of the dispute resolution provisions printed on the billing statements provided to Leading Edge. *See* Resistance to Motion at 14-15. To the extent Leading Edge argues that FCS failed to perform its duties under the dispute

19

resolution provisions, thereby raising a genuine issue of material fact regarding its breach of contract claim, such argument fails.

The dispute resolution provisions provide that Leading Edge may dispute suspected billing errors made by FCS as creditor. Leading Edge Appendix at 10. Upon doing so, Leading Edge would "remain obligated to pay the parts of [its] bill not in dispute, but [it would] not have to pay any amounts in dispute during the time the creditor is resolving the dispute. During that time, the creditor may not take any action to collect disputed amounts or report disputed amounts as delinquent." *Id.*

For the purposes of the Motion, the court shall assume that the dispute resolution provisions modify the overarching Credit Agreement with respect to the individual billing statements on which they appear. *Cf. Cody Foster & Co., Inc. v. Urban Outfitters, Inc.*, 14-CV-80, 2015 WL 12698385, at *8 (D. Neb. Sept. 25, 2015) (analyzing a contractual relationship consisting of "a master agreement governing the entire relationship between the parties" and separate purchase orders creating additional obligations as to each order). Nevertheless, Leading Edge has produced no evidence that FCS failed to perform its duties under the dispute resolution provisions. The evidence suggests that, consistent with the dispute resolution provisions, the parties behaved as follows: (1) Leading Edge disputed the feed charges at issue, *see, e.g.*, Leading Edge Appendix at 34-35; (2) FCS investigated the disputed charges, reassigned certain charges to separately numbered accounts and, ultimately, concluded that the charged amounts in dispute were accurately billed to Leading Edge, *see id.*; *see also* FCS Supplemental Appendix at 6-7; and (3) after resolving the matter to its satisfaction, FCS maintained its position that payment for the feed charges remained due, *cf.* FCS Supplemental Appendix at 31 (describing FCS's practice of investigating and correcting or maintaining charges). Based on the evidence to this effect, the court finds no basis for determining that FCS failed to perform its duties under the dispute resolution provisions before declaring Leading Edge in default and initiating the

instant action. Accordingly, to the extent Leading Edge argues otherwise, such argument fails to demonstrate a genuine issue of material fact regarding FCS's breach of contract claim.

In light of the foregoing, the court finds that Leading Edge has failed to generate a genuine issue of material fact with respect to FCS's failure to perform all the terms and conditions of the contract between the parties. Correspondingly, FCS has demonstrated the absence of a genuine issue of material fact with respect to its breach of contract claim. Therefore, summary judgment is appropriate on this claim. The court shall grant the Motion with respect to the breach of contract claim.

### d. Personal guaranty

FCS argues that Leading Edge and Legred, as personal guarantor, should be held jointly and severally liable for any damages incurred as a result of Leading Edge's breach of contract. Brief in Support of Motion at 9. Leading Edge makes no arguments with respect to this issue. *See generally* Resistance to Motion.

In the Credit Agreement, Legred agreed to "jointly, severally and unconditionally guarantee the full and timely payment of all amounts due" to FCS. FCS Appendix at 10. "[N]o different rule obtains in construing personal guaranties than other contracts, save that when the terms of a guaranty are once ascertained the liability of the guarantor is not to be extended by implication." *Avnet, Inc. v. Catalyst Res. Grp., LLC*, 791 F.3d 899, 902 (8th Cir. 2015) (alterations omitted) (quoting *Harman v. Hartman*, 160 N.W. 295, 297 (Iowa 1916)). In other words, it is a "well-established principle of Iowa law . . . that the same rules of construction generally applicable to contracts apply equally to personal guaranties." *Id.*

Based on the language of the instrument, the court finds that the personal guaranty, as signed by Legred, was entered into with the requisite mutual assent necessary to create a valid contract. *See Schaer v. Webster Cty.*, 644 N.W.2d 327, 338 (Iowa 2002)

(recognizing that "mutual assent is based on objective evidence" (quoting *Hill-Shafer P'ship v. Chilson Family Tr.*, 799 P.2d 810, 815 (Ariz. 1990))). Accordingly, pursuant to the terms of the personal guaranty, the court finds that both Leading Edge and Legred are jointly and severally liable for any damages incurred as a result of Leading Edge's breach of contract.

### 2. Damages

As a result of Leading Edge's breach of contract, FCS argues that it is entitled to $116,808.68 in damages, plus an additional 18% in interest. Brief in Support of Motion at 7-8. Specifically, FCS argues that it is entitled to $18,406.60 in unpaid invoices, plus a 1.5% finance charge applied to that sum (per the Credit Agreement), plus attorney's fees incurred as collection costs (per the Credit Agreement), arriving a total recovery of $116,808.68. *See id.* at 3-4, 7-8. Leading Edge acknowledges that, to the extent FCS is entitled to recovery, it is entitled to the $18,406.60 in unpaid invoices plus the 1.5% finance charge. *See* Resistance to Motion at 13. However, Leading Edge argues that FCS is not entitled to recover attorney's fees. *See id.* at 13-19. Leading Edge argues that the governing terms of the parties' contractual relationship do not permit recovery of attorney's fees, that documentation supporting the amount of FCS's attorney's fees was untimely produced and, when produced, the documentation was insufficient to establish the amount requested. *See id.*

"The party seeking damages has the burden to prove them." *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 641 (Iowa 1996). "There is a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages." *St. Malachy Roman Catholic Congregation of Geneseo v. Ingram*, 841 N.W.2d 338, 352 (Iowa 2013) (quoting *Pavone v. Kirke*, 801 N.W.2d 477, 495 (Iowa 2011)). "If the uncertainty merely lies in the amount of damages sustained, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or

22

approximated." *Id.* (alteration omitted) (quoting *Pavone*, 801 N.W.2d at 495). "'Thus, some speculation on the amount of damages sustained is acceptable,' but a plaintiff cannot recover overly speculative damages." *Id.* (quoting *Pavone*, 801 N.W.2d at 495). Typically, "[t]he amount of damages awarded is a jury function." *Williams v. Barnhill*, 791 N.W.2d 429, 2010 WL 3894454, at *7 (Iowa Ct. App. Oct. 6, 2010) (unpublished table decision).

At the summary judgment stage, the court finds that FCS has proven only that it is entitled to $18,406.60 in unpaid invoices as a matter of law. *See* FCS Appendix at 5-6 (charting unpaid invoices); *see also id.* at 26-39, 144-45 (invoices detailing unpaid feed deliveries ordered by Leading Edge). Because there is no particularized accounting or documentation detailing the amount of other damages—the finance charges assessed[3] and attorney's fees accrued as collection costs—they are overly speculative at this stage and shall be submitted to the jury. *Cf. id.* at 167 (summarily accounting for lump sum finance charge and attorney's fees damages).

Leading Edge argues that FCS is not entitled to any attorney's fees as a matter of law, due to the operation of the dispute resolution provisions printed on the billing statements provided by FCS. *See* Resistance to Motion at 14-15. However, such argument fails. While it is true that the dispute resolution provisions make no mention of

---

[3] While the Credit Agreement unmistakably provides for the accrual of a 1.5% finance charges, such charges accrue on a monthly basis and are calculated based on the overdue amounts as they exist in any given month. *See* FCS Appendix at 9. Because Leading Edge has apparently made certain payments on its feed account since the commencement of this litigation, *see, e.g., id.* at 167 (showing several payments made after the state court petition was filed on April 11, 2016), the overdue amounts in any given month would have fluctuated accordingly, thereby impacting the accrual of the finance charges. Absent a detailed accounting of the activity in Leading Edge's feed account, the court cannot accurately determine at this stage the amount of finance charges to which FCS is entitled. *See St. Malachy*, 841 N.W.2d at 352 (recognizing that plaintiffs must prove both entitlement to damages and the amount to which they are entitled).

23

FCS's recovery of attorney's fees, *see* Leading Edge Appendix at 10, the Credit Agreement unmistakably does, *see* FCS Appendix at 9.  To whatever extent the dispute resolution provision may modify the Credit Agreement by amending new terms to the Credit Agreement, *Iowa Arboretum*, 886 N.W.2d at 706; *Cody Foster & Co.*, 2015 WL 12698385, at *8, its silence on the recovery of attorney's fees does not simply erase the valid provision included in the Credit Agreement.  As such, the court finds that recovery of attorney's fees may be appropriate, to the extent a reasonable basis for such damages is proved to the jury.

Leading Edge also argues that FCS may not recover attorney's fees because it has failed to "produce[] any of the actual underlying bills associated with those attorney's fees" during discovery and argues that the court should prevent recovery as a discovery sanction. *See* Resistance to Motion at 13-14.  The court agrees that FCS's failure to produce sufficient documentation for its attorney's fees precludes recovery for such damages at the summary judgment stage.  However, the court declines to sanction FCS for its purported failure to produce such documentation during discovery.  The parties have indicated to the court that discovery remains ongoing in this case, despite the mutually agreed-upon discovery deadlines and the looming trial date.  *Compare* Scheduling Order and Discovery Plan (docket no. 13) (providing for a discovery deadline of March 22, 2017), *and* March 31, 2017 Order (docket no. 52) (extending the discovery deadline to April 28, 2017), *with* Joint Motion to Extend Deadline for Filing Motions in Limine (docket no. 83) (informing the court that the parties will "take a limited number of depositions" in late-July of 2017). The court finds that, to the extent FCS's failure to provide sufficient documentation of its attorney's fees violated Federal Rule of Civil Procedure 26, such violation is harmless due to the ongoing nature of the parties' discovery.  *See* Fed. R. Civ. P. 37(c) (providing the availability of sanctions for "fail[ure] to provide information" under Rule 26, "unless the failure was substantially justified or harmless").  However, the lack of sufficient

documentation for FCS's attorney's fees, as well as the calculation and assessment of finance charges, nevertheless precludes summary judgment with respect to such damages. *See, e.g.*, *Pool & Spa Concepts, L.L.C. v. Russett*, 829 N.W.2d 193, 2013 WL 750130, at *3-4 (Iowa Ct. App. Feb. 27, 2013) (unpublished table decision) (affirming district court's finding that there was no reasonable basis for damages, where the plaintiff "offered no delineation" of the work performed and the value of such work); *Eldon C. Stutsman, Inc. v. Rogers*, 787 N.W.2d 479, 2010 WL 2602171, at *3, *7 (Iowa Ct. App. June 30, 2010) (unpublished table decision) (finding that amount of crop-related damages are overly speculative where the counter-claimant merely estimated the damages without introducing "any photographic evidence" or "prior or subsequent years' crop yield information from which to compare his [damaged] yields").

In light of the foregoing, the court shall grant the Motion with respect to damages in the amount of $18,406.60, representing the face value of the unpaid invoices, but the court shall deny the Motion with respect to damages relating to the assessment of finance charges and attorney's fees. The amount of such damages must be proven to the jury at trial.

## VII.  MOTION TO VACATE

In the Motion to Vacate, Leading Edge argues that the $94,688.98 currently under attachment is excessive and requests that the court discharge $73,718.51 of the attached funds. *See* Motion to Vacate at 1. Leading Edge also requests an award of attorney's fees incurred during the pursuit of the Motion to Vacate. *Id.*

Attachment is a creature of statute, "unknown to the common law." *Estate of Lyon* ex rel. *Lyon v. Heemstra*, 779 N.W.2d 494, 2010 WL 200454, at *2 (Iowa Ct. App. Jan. 22, 2010) (unpublished table decision) (quoting *Edwards v. Tracy*, 212 N.W. 317, 318 (Iowa 1927)). Iowa law provides that, on a defendant's motion, the court may discharge a previously ordered "attachment or any part thereof" if cause is shown "that the

attachment should not have issued, or should not have been levied on all or some part of the property held." Iowa Code § 639.63. "If more property is attached in the aggregate than the plaintiff is entitled to, the surplus must be abandoned . . . ." *Id.* § 639.18. "Any surplus of the attached property and its proceeds shall be returned to the defendant." *Id.* § 639.59.

Leading Edge argues that it is entitled to the discharge of $73,718.51 of the attached funds because it represents a surplus beyond what FCS is entitled to under Iowa law. *See* Motion to Vacate at 1. According to Leading Edge, the attachment should be no greater than $20,970.47,[4] which it claims represents the amount of purported default on its account and the only debt presently due. *See id.* at 5 (arguing that, unlike the amount in default, the collection fees incurred by FCS are "not matured"). Leading Edge further argues that the attachment should not cover the $33,985 in attorney's fees incurred by FCS in pursuit of collection or any other additional funds. *Id.* FCS argues that the amount of attached funds need not correspond precisely to the $20,970.47 that remains in default. *See* Resistance to Motion to Vacate at 4. FCS emphasizes that, at the time the attachment was ordered, Leading Edge had an outstanding balance of $63,407.05, and claims that Leading Edge is not entitled to the release of attached funds simply because they reduced the outstanding balance with partial payments. *See id.* at 4-5. FCS further argues that its attorney's fees remain subject to attachment because Leading Edge remains in default on its account, requiring FCS to continue accumulating fees and costs to secure repayment. *Id.* at 5.

As an initial matter, the court notes that the figures identified by Leading Edge in the Motion to Vacate appear to be outdated. In the Motion to Vacate, Leading Edge refers

---

[4] Leading Edge refers to "$20,974" as the amount of funds purportedly in default. Motion to Vacate at 5. This appears to be an error. *Compare id. with id.* at 1, 3 (referring to "$20,970.47" in funds relating to FCS's claims).

to $20,970.47 as the amount in default and $33,985 as the accrued attorney's fees—amounting to $54,955.47 in then-accumulated damages. *See* Motion to Vacate at 1, 3; *see also* Resistance to Motion to Vacate at 5 (referring to $20,970.47 as the amount in default). In light of the evidence submitted for purposes of summary judgment, the court finds that the amount in default is, in fact, $18,406.60, *see* FCS Appendix at 5-6 (charting unpaid invoices); *see also id.* at 26-39, 144-45 (invoices detailing unpaid feed deliveries ordered by Leading Edge), and finds that FCS alleges additional damages, consisting of attorney's fees and finance charges, amount to $98,402.08—totaling $116,808.68 in presently alleged damages, *see id.* at 167. The court shall rely on these figures from the summary judgment materials when assessing the merits of the Motion to Vacate.

The debt secured by attachment covers "that which is due or owing from one person to another; that for which a person is held, or which he is bound to pay." *Estate of Lyon*, 2010 WL 200454, at *2 (quoting *Raver v. Webster*, 3 Iowa 502, 512 (1856)). Under the Credit Agreement, "[i]f [Leading Edge] defaults and FCS refers [Leading Edge] to an attorney for collection, FCS may . . . charge [Leading Edge] or collect from [Leading Edge], FCS's collection costs, including court costs and attorney fees." *See* FCS Appendix at 9. Under the Credit Agreement, FCS is entitled to attorney's fees from Leading Edge upon the satisfaction of two conditions precedent: (1) Leading Edge defaulting and (2) FCS retaining an attorney to pursue collection. Leading Edge defaulted by "fail[ing] to make a[] payment when due," *id.* (defining "default" within contract), and FCS retained an attorney to pursue collection via the instant action, *see* Iowa Code § 537.7102(4) (defining "debt collection" as "an action . . . in the collection or attempted collection of a debt"). Because both conditions precedent are satisfied—and, furthermore, because the court has found as a matter of law that FCS has succeeded on its breach of contract claim—the Credit Agreement provides that attorney's fee are presently due, subject to a jury determination of the amount to which FCS is entitled. As such, they are

subject to attachment. FCS is entitled to the recovery of $18,406.60 and has calculated alleged attorney's fees and finance charges totaling $98,402.08. Because the cumulative anticipated recovery exceeds the $94,688.98 currently under attachment, the court finds that continued attachment of such funds is warranted. *See Estate of Lyon*, 2010 WL 200454, at *2 (referring to attachment as "an execution by anticipation" (quoting *Edwards*, 212 N.W. at 318)). Accordingly, the court shall deny the Motion to Vacate.

## VIII. CONCLUSION

In light of the foregoing, the court **ORDERS** as follows:

(1)    Leading Edge's Motion to Strike (docket no. 77) is **DENIED**;

(2)    FCS's Motion for Summary Judgment (docket no. 53) is **GRANTED IN PART and DENIED IN PART**. The court shall enter judgment in favor of FCS on its breach of contract claim, in the amount of $18,406.60, to be made payable from the court-attached funds currently held by the Clerk of Court. Assessment of all other damages and determination of the merits of Leading Edge's counterclaims remain pending for trial;

(3)    Leading Edge's Motion to Vacate (docket no. 70) is **DENIED**.

**IT IS SO ORDERED.**

**DATED** this 20th day of July, 2017.

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

28